# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| JESSICA JULIEN and HOLLYWOOD SMILES ATL, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGIA BOARD OF DENTISRY, TANJA D. BATTLE, in her official capacity as Executive Director of the Georgia Board of Dentistry, STEVE HOLCOMB, H. BERT  YEARGAN, RICHARD BENNETT, REBECCA BYNUM, DALE MAYFIELD, TRACY GAY, THOMAS P. GODFREY, GREGORY G. GOGGANS, LOGAN "BUZZY" NALLEY JR., ANTWAN L. TREADWAY, and WENDY JOHNSON, in their individual and official capacities as Members of the Georgia Board of Dentistry, and CHRISTOPHER M. CARR, in his official capacity as the Attorney General of Georgia,<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiff Jessica Julien ("**Julien**") and Hollywood Smiles ATL, LLC ("**Smiles**") (collectively, "**Plaintiffs**") allege the following against Defendants the Georgia Board of Dentistry (the "**Board**"), Steve Holcomb, H. Bert Yeargan, Richard Bennett, Rebecca Bynum, Dale Mayfield, Tracy Gay, Thomas P. Godfrey, Gregory G. Goggans, Logan "Buzzy" Nalley Jr., Antwan L. Treadway, Wendy Johnson (each of the foregoing individuals is sued in his or her individual capacity and in his or her official capacity and is referred to herein as a "**Member**" and collectively as the "**Members**"), Tanja D. Battle in her official capacity as Executive Director of the Board, and Christopher M. Carr in his official capacity as Attorney General of Georgia (collectively, the "**Defendants**"):

## NATURE OF THE CASE

1.      The Board and its Members, the overwhelming majority of whom are market participants in the Relevant Market, as described below, and exercise controlling authority over the Board's operations, have colluded and are colluding among themselves and through the Board with other dentists practicing in Georgia to exclude non-dentists, such as Plaintiff Julien, from competing in Georgia with licensed dentists ("**dentists**") in the provision of teeth whitening services (collectively, including providing take-home teeth whitening kits, "**teeth**

**whitening services**"). Nine of the Members are practicing dentists in the State of Georgia who actually or potentially compete with one another and with dentists in providing dental services to individuals in Georgia. These dentist Members also actually or potentially compete with one another, with other dentists in Georgia, and with Plaintiffs in providing teeth whitening services. Defendants have conspired to use the Board's enforcement authority to exclude Plaintiffs and other non-dentists from the market for teeth whitening services. Specifically, the Board has repeatedly issued cease-and-desist orders to non-dentists who offer teeth whitening services even though the enabling legislation that creates the Board does not authorize the Board to regulate the provision of teeth whitening services or to restrict the offering of such services by persons not licensed by the Board to practice dentistry in Georgia. Further, the Board and its Members initiated this conspiracy and continue it without authorization from the state of Georgia or active supervision by any state authority.

2.     The actions of the Board and the Members, which are enforceable by Defendant Carr acting in his capacity as Attorney General, preclude non-dentists from offering teeth whitening services, and coerce consumers in Georgia to use only dentists licensed by the Board for such services. In turn, the agreements that

the Members have reached at Board meetings, coupled with enforcement actions taken to effectuate those agreements, ban non-dentists from providing teeth whitening services in Georgia. On their face, the Board's actions and agreements aim to increase prices, reduce consumer choice, and restrict output of teeth whitening services in Georgia. Moreover, the Members' actions with respect to teeth whitening services have been effectuated without any clear articulation of State policy and are, in fact, in derogation of State policy as there is no present, significant, or substantiated harm that threatens public health and safety by the provision of teeth whitening services in Georgia by persons other than licensed dentists. The actions of the Members have also been implemented without active supervision by the State.

3.     The agreements reached by the Members to exclude non-dentist from offering teeth whitening services have the actual and intended effect of restricting competition in the provision of and the supply of teeth whitening services in Georgia.

4.     The Board and its Members effectuate the conspiracy by issuing orders commanding individuals not licensed by the Board to practice dentistry in Georgia

to cease-and-desist from the provision of teeth whitening services. These orders are issued by the Board without any clearly articulated and affirmatively expressed state policy authorizing their issuance with respect to teeth whitening services. Moreover, these orders are issued even though the provision of teeth whitening services by persons other than licensed dentists poses no present, significant, or substantiated risk to public health and safety in Georgia.  In fact, teeth whitening products used by Plaintiffs are available for sale directly to persons in Georgia. Individuals who purchase such products may use those products without seeking the services of a licensed dentist. The Board and Members have not attempted to prevent the sale of such products to individuals in Georgia. Accordingly, the only rational reason for the issuance of orders is to shield licensed dentists from competition in the provision of teeth whitening services.

5.     The Board's actions unreasonably restrain trade and competition in the provision of teeth whitening services in Georgia in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and monopolize or attempt to monopolize the market for teeth whitening services in Georgia violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

6.      Further, to the extent that the cease-and-desist order issued by the Board (the "**Order**") against Plaintiff Julien prohibits Plaintiff Julien from engaging in the retail sale of teeth whitening products for home use, the Order is inconsistent with the Board's own interpretation of the Georgia Dental Practice Act (the "**Act**" before this court and violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution.

## PARTIES

7.      Plaintiff Jessica Julien is a resident and citizen of the State of Georgia. Before the events set forth in this Complaint, Julien provided teeth whitening services to the public through Smiles. Julien provided such services primarily in Duluth, Georgia. As a result of the issuance of the Order by the Board on May 21, 2015, Plaintiff Julien has not provided teeth whitening services in the State of Georgia and has not sold teeth whitening products in the State of Georgia since that date.

8.      Plaintiff Smiles is a limited liability company organized and existing under the laws of the State of Georgia with its principal place of business in Duluth, Georgia.  Plaintiff Julien is the sole member and principal of Smiles.  Before the

events set forth in this Complaint, Smiles provided teeth whitening services to the public.  As a result of the issuance of the Order by the Board to Plaintiff Julien on May 21, 2015, Smiles has not provided teeth whitening services to any person in the State of Georgia and has not sold teeth whitening products in the State of Georgia since that date.

9.      The Board is a professional regulatory board charged with regulating the practice of dentistry in the interest of the public health, safety, and welfare of the citizens of Georgia. The Board is organized, exists, and transacts business under and by virtue of the laws of the State of Georgia, with its principal office and place of business located at 2 Peachtree St., NW Atlanta, Georgia, 30303.

10.     Defendant Tanja B. Battle is the Executive Director of the Board and is tasked with enforcing orders of the Board. Defendant Battle is being sued in her official capacity.

11.     Defendants Thomas P. Godfrey, D.M.D. (President), Gregory G. Goggans, D.M.D., (Vice-President),  Richard Bennett, D.M.D., Tracy Gay, D.M.D., Steve Holcomb, D.M.D., Dale Mayfield, D.M.D., Logan Nalley Jr., D.M.D., Antwan L.

Treadway, D.M.D., H. Bert Yeargan, D.M.D., Rebecca B. Bynum, R.D.H., and Wendy Johnson are Members of the Board. They are being sued in both their official and individual capacities.

12.     Thomas Godfrey is a practicing dentist with an office in Atlanta, Georgia. He and his practice offer and provide teeth whitening services and related products. On information and belief, Thomas Godfrey offered and provided these services at the time the Board issued the Order.

13.     Gregory Goggans is a practicing orthodontist at Smile Doctors Braces, in Douglas, Georgia.

14.     Richard Bennett is a practicing dentist at BGW Dental Group in Gainesville, Georgia. Dr. Bennet and the BGW Dental Group offer and provide teeth whitening services and related products. On information and belief, Dr. Bennett and the BGW Dental Group offered and provided these services at the time the Board issued the Order.

15.     Tracy Gay is a practicing dentist at Middle Georgia Family Dentistry in Dublin, Georgia. Dr. Gay and Middle Georgia Family Dentistry offer and provide teeth whitening services and related products. On information and belief, Dr. Gay offered and provided these services at the time the Board issued the Order.

16.     Steve Holcomb is a practicing dentist at Dental Associates of Middle Georgia in Byron, Georgia. Dr. Holcomb and Dental Associates of Middle Georgia offer and provide teeth whitening services and related products. On information and belief, Dr. Holcomb and Dental Associates of Middle Georgia offered and provided these services at the time the Board issued the Order.

17.     Dale Mayfield is a practicing dentist at Kool Smiles in Decatur, Georgia. Kool Smiles offers services throughout Georgia, including in Atlanta, Columbus, Dalton, Forest Park, Lilburn, Macon, and Smyrna. Dr. Mayfield and Kool Smiles offer and provide whitening services and/or related products. On information and belief, Dr. Mayfield and Kool Smiles offered and provided these services at the time the Board issued the Order.

18.     Logan "Buzz" Nalley, Jr. practices prosthodontics at Augusta Prosthodontics
Associates, LLC in Augusta, Georgia. Prosthodontics is the branch of dentistry
concerned with the design, manufacture, and fitting of artificial replacements for
teeth and other parts of the mouth and jaw.

19.     Antwan Treadway is an oral surgeon at Atlanta Oral & Facial Surgery in
Atlanta, Georgia.

20.     Bert Yeargan is a practicing dentist at Yeargan Dental in Brunswick,
Georgia. Dr. Yeargan and Yeargan Dental offer and provide teeth whitening
services and related products. On information and belief, Bert Yeargan and
Yeargan Dental offered and provided these services at the time the Board issued
the Order.

21.     Rebecca Bynum, is a Member of the Georgia Board of Dentistry and a
practicing dental hygienist. Ms. Bynum was appointed by to the Board by the
Governor of Georgia from a list of practicing dental hygienists submitted by the
Georgia Dental Hygienists Association, in accordance with O.C.G.A. § 43-11-2
(2016). Ms. Bynum is a registered dental hygienist at Azalea City Family Dentistry

in Valdosta, Georgia. Azalea City Family Dentistry offers and provides teeth whitening services and related products. On information and belief, Azalea City Family Dentistry offered and provided these services at the time the Board issued the Order.

22.     Wendy Johnson, who is not a dentist or dental hygienist, is a Member of the Georgia Board of Dentistry and was appointed by the Governor of Georgia in accordance with O.C.G.A. § 43-11-2 (2016). Ms. Johnson is a retail pharmacist for Rite Aid Corporation, and serves as the consumer member of the Board (the "**Consumer Member**").

23.     Defendant Christopher M. Carr, is the Attorney General of Georgia.  Upon information and belief, he is a citizen and resident of the State of Georgia and his principal place of business is Office of the Attorney General, 40 Capital Square, S.W., Atlanta, Georgia. Defendant Carr is tasked with enforcing the criminal penalties of the Act, and is sued only in his official capacity.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this action for damages, declaratory relief, costs of suit, and reasonable attorneys' fees arising under, inter alia, Sections 1 and 2 of the Sherman

Act, 15 U.S.C. §§ 1-2; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02;

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the

Constitution of the United States. Accordingly, this Court has subject matter

jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and

antitrust regulation).

25.    This Court has personal jurisdiction over Defendants because each resides or

has his, her, or its principal place of business in this District, and because

Defendants' actions have been taken in this District and have caused, are

continuing to cause, and threaten to cause in the future harm in this District.

Further, Defendants' wrongful conduct, in the form of    their anticompetitive and

unconstitutional activity has been purposefully conducted within this District (*e.g.*,

at the Board's offices in Atlanta, Georgia), and Plaintiffs' injuries relate to such

conduct in this District.

26.    Venue is proper within this District under 28 U.S.C. §§ 1391(b) and 15

U.S.C. § 22 because one or more Defendants reside in this District, all Defendants

are residents of the State of Georgia, and a substantial part of the events giving rise

to the claims Plaintiffs allege occurred in this District.

27.     The Defendants' actions substantially and adversely affect interstate commerce in the Relevant Market as described below. Defendants provide services in interstate commerce and use products to perform teeth whitening services that are sold across state lines and from outside the State of Georgia into the State of Georgia. In addition, by restricting the availability of teeth whitening services in Georgia, the flow of interstate commerce is interrupted. Non-dentists who would otherwise buy supplies needed for the provision of teeth whitening services do not purchase such supplies and any related services. Thus, Defendants' actions have the effect of reducing the amount of interstate commerce to the detriment of consumers.

## THE GEORGIA DENTAL PRACTICE ACT

28.     The Georgia Dental Practice Act (the "**Act**") is set forth in Ga. Code §§ 43-11-1 through 43-11-82. The Rules of the Georgia Board of Dentistry are set forth in Georgia Compiled Rules & Regulations Chapter 150.

29.     Under the Act, any person who engages in any activity considered to be the practice of dentistry "without obtaining a license to practice from the board shall

be guilty of a felony" and subject to fines and imprisonment. Ga. Code § 43- 11-

50. The unlawful practice of dentistry is punishable by imprisonment of two to five

years, a fine of not less than $500, or both. *Id.*

30.     To become a licensed dentist in Georgia, one must have a doctoral degree in

dentistry, and must pass an examination approved by the Georgia Board of

Dentistry. Ga. Comp. R. & Regs. 150-3-.04. On information and belief, a doctoral

degree in dentistry is typically a four-year course of study in addition to a four-year

undergraduate degree. On information and belief, the cost of dental school tuition

in Georgia for a four-year doctoral degree ranges between $85,000 and $240,000,

depending on the school chosen and the state of residency of the student.

31.     The Act authorizes the Board to bring an action to enjoin any person, firm,

partnership, or corporation who engages in the practice of dentistry without being

licensed to do so by the Board. Ga. Code. § 43-11-2(e).

32.     The Act does not authorize the Board to designate the provision of teeth

whitening services as the "practice of dentistry." *See* Ga. Code. §§ 43-11-1, 43-11-

17.

33.     Chapter 50 of the Georgia Compiled Rules & Regulations does not address whether, or under what circumstances, persons not licensed as dentists may engage in the provision of teeth whitening services.

34.     Nonetheless, the Board purports to have decided that the provision of teeth whitening services constitutes the unauthorized practice of dentistry. *See* Ex. B (Georgia Board of Dentistry Letter to Atlanta Better Business Bureau).

35.     The Board has previously explained and admitted that the Act does not regulate "the sale of [teeth whitening] products". Def.'s Reply Mem., *Holton v. Battle*, Case No. 1:14-cv-03824, ECF No. 98 at 7 (N.D. Ga. Jan. 23, 2017) ("Georgia's Dental Practice Act does not permit the Board to regulate product sales."); Def.'s Reply Mem., *Colindres v. Battle*, Case No. 1:15-cv-02843, ECF No. 16 at 12 (N.D. Ga. Oct. 14, 2015) ("The Dental Practice Act, however, does not regulate the sale of products."). Thus the Board acknowledges that the Act permits persons other than licensed dentists to engage in the unregulated retail sale of teeth whitening products for home use, regardless of the products' concentration level. Moreover, in accordance with this view, the Act allows customers to

purchase teeth whitening products without prior authorization by prescription or other means or supervision by a dentist licensed by the Board. The Board has also decided that the provision of teeth whitening services constitute the unauthorized practice of dentistry. *See* Ex. B (Georgia Board of Dentistry Letter to Atlanta Better Business Bureau).

36.     Effective July 1, 2016, the Georgia Legislature clarified that the powers granted to independent state regulatory boards are to be construed consistent with a statewide policy in favor of promoting competition.  See Georgia Professional Regulation Reform Act, HB 952 (2015-16) § 1.

37.     Section 1, paragraph 2 of HB 952 states that that it is "the policy of State of Georgia to displace competition only when necessary to protect consumers from present, significant and substantiated harms that threaten public health and safety". *Id.*

38.     Section 1, paragraph 2 of HB 952 also states that it is "the policy of the State of Georgia to increase economic opportunities for all of its citizens by promoting competition and thereby encouraging innovation and job growth". *Id.*

39.     To the extent the Board has acted on its determination that the provision of teeth whitening services constitutes the unauthorized practice of dentistry, the Board has not acted pursuant to any clear articulation of state policy to displace competition in the market for teeth whitening services.

40.     In fact, as noted above, the Board's actions extend beyond its delegated authority under the Act and, moreover, state policy is contrary to the Board's actions. Further, the Board has not produced or made efforts to gather evidence that would be relevant to make a determination, or otherwise made public any evidence that would be sufficient to show that the provision of teeth whitening services by non-dentists poses a present, significant and substantiated harm to public health and safety in Georgia. On information and belief, the Board has not conducted or published any study concerning whether provision of teeth whitening services by persons other than licensed dentists threaten public health or safety. On information and belief, the Board has not held any hearings in for purposes of assessing whether the provision of teeth whitening services by non-dentists in Georgia poses a present or substantial risk to public health and safety in the State. Moreover, by excluding non-dentists from the provision of teeth whitening

services, the Board's policy has the intended and actual effect of limiting economic opportunities for non-dentist entrepreneurs that offer teeth whitening services, thereby hampering job growth and discouraging innovation in the provision of teeth whitening services in Georgia.

41.    The provision of teeth whitening services by non-dentists in Georgia poses no "present, significant, or substantiated harm" to consumers in Georgia that threatens public health and safety. Consumers in Georgia may purchase teeth whitening kits online or at retail stores and use them in their own homes. Upon information and belief, parents may administer teeth whitening products to their children without seeking the services of a dentist. The Board and its Members have made no attempt to regulate the use of teeth whitening products by individuals or the administration of teeth whitening products by some family members, such as parents for minor children. The Board and its Members have not made any attempt, because it has admitted that it no authority to do so or, to restrict the sale of teeth whitening kits and other teeth whitening products to consumers in Georgia.

42.    The Board has made no attempt to prevent consumers from using teeth whitening kits themselves and has not promulgated any rule that would define a

consumer's self-administration of teeth whitening products as constituting the unlicensed practice of dentistry.

## COMPOSITION OF THE BOARD AND FINANCIAL INTEREST IN TEETH WHITENING SERVICES

43.    Nine of the 11 members of the Board are practicing dentists, each appointed by the Governor of Georgia from a list of practicing dentists chosen by the Georgia Dental Association, in accordance with O.C.G.A. § 43-11-2 (2016). The Georgia Dental Association's membership consists of practicing dentists licensed by the Board and who are themselves practicing dentists. Currently, all seats on the Board designated for dentists are filled by dentists who practice in Georgia.

44.    The nine dentists currently on the Board are: Steve Holcomb, H. Bert Yeargan, Richard Bennett, Dale Mayfield, Tracy Gay, Thomas P. Godfrey, Gregory G. Goggans, Logan "Buzzy" Nalley, Jr., and Antwan L. Treadway.

45.     The dentist Members collectively fill the majority of seats on the Board and have controlling authority. As such, the dentist Members can and do exercise control over operations, decisions, and actions taken by the Board.

46.     Each practicing dentist Member is financially interested in the decisions reached by the Board, and each practicing dentist Member is an actual or potential competitor of non-dentists in the Relevant Market as described below. In addition, as noted above, dentist Members can, and do, continue to engage in the for-profit business of providing dental services during the term they are appointed to serve on the Board.

47.     At least 7 of the 11 Members (i.e. Thomas Godfrey, Richard Bennet, Tracy Gay, Steve Holcomb, Dale Mayfield, Bert Yeargan, Rebecca Bynum) offer, or work at a dental practice that offers, teeth whitening services and thus have a financial interest in provision of teeth whitening services. As such, each of these 7 Members has a financial stake in the Board's actions as they relate to teeth whitening services and have an economic incentive to use the Board's processes to further those financial interests.

## RELEVANT MARKET FOR TEETH WHITENING SERVICES

48.    Teeth whitening is a cosmetic service in which the appearance of stains or discoloration on the tooth enamel are reduced through the application of a whitening agent, typically hydrogen peroxide or carbamide peroxide.

49.    The United States Food and Drug Administration ("**FDA**") categorizes teeth whitening products as cosmetic products, rather than drugs that would require a prescription for use. In 2014, the FDA rejected a petition by dentists and the American Dental Association to generally categorize tooth-whitening products as drugs. See Ex. A (FDA Response Denying Citizen Petition to Classify Peroxide-Containing Tooth Whitener Products as Drugs). Accordingly, the FDA does not require the demonstration of the safety and efficacy of teeth whitening products and no prescription is required to purchase teeth whitening products.

50.    Teeth whitening products are widely available for over-the-counter ("**OTC**") purchase through traditional brick-and-mortar retail outlets (*e.g.*, grocery stores, convenience stores, pharmacies) and online. Such products include pens, gels, strips, trays, applicators, and light-emitting diode ("**LED**") or ultra violet ("**UV**") devices designed to hasten the whitening process.

51.     Consumers in Georgia and elsewhere may purchase teeth whitening products in any commercially available concentration. Products come with pre-packaged instructions, and customers may legally apply products to their own teeth without any previous experience or the supervision of a licensed dentist or other professional.

52.     In many states, in addition to offering teeth whitening products, teeth whitening services are offered by dentists and non-dentists alike. Teeth whitening services may include in-person assistance and instruction for applying teeth whitening products, providing a space for customers to apply the products, and the provision of customized teeth whitening kits and other tailored service offerings. Teeth whitening services may be provided at a multitude of outlets including, but not limited to private offices occupied by dentists or non-dentists, standalone locations, shopping malls, spas, resorts, and salons.

53.     Teeth whitening services are a standard serviced offered by many dentists and dental practices.  Over time, businesses and locations run by non-dentists have begun to offer teeth whitening services that compete directly with dentists.

54.     Providers of teeth whitening services, including practicing dentists in Georgia, have a direct financial interest in the laws, rules, and regulations pertaining to teeth whitening products and teeth whitening services.

55.     While individual practices vary among businesses, many non-dentists that provide teeth whitening services, previously including Plaintiffs, generally operate in the following way: non-dentist suppliers sell pre-packaged teeth whitening products with written instructions to their customers. They then advise the customer on how to use the product and supervise the customer's use of the product. The provider generally hands a strip or tray containing the whitening solution to the customer, who then applies the product to his or her own teeth in a space (typically a chair) provided by the non-dentist. The customer's teeth are then exposed to a UV or LED light source for around from 15-60 minutes. Either the provider or customer can position the light source in front of the customer's mouth.

56.     Non-dentists generally do not enter customers' mouths in providing teeth whitening services. Instead, teeth whitening services offered by non-dentists are generally limited to discussing products with customers based on general

background information supplied by the customer, instructing customers on how to apply the product to their own teeth, providing customers with a comfortable chair to sit in while using the product, providing customers with an enhancing light, and offering follow-up customer support. Plaintiffs operated in this manner before issuance of the Order in May 2015.

57.    Take-home kits may include a custom whitening tray that the customer fills with gel and applies to his or her own teeth. The customer may set up an appointment to receive instructions on how to dispense the whitening solution into the tray before fitting the tray into his or her mouth. In addition, written instructions are included with the take-home kits and the whitening agent, which is generally a 15-20 percent carbamide peroxide solution. Take-home kits are typically made to be used daily for about one to two weeks, and can be used for touch-up applications thereafter. Certain brands may be worn overnight for convenience. The ability to wear certain brands overnight, however, may vary depending on the strength of the whitening agent.

58.    Take-home kits require customers to self-apply the gel in essentially the same manner as when using an OTC teeth whitening product purchased through a

traditional brick-and-mortar outlet ("**OTC product**"). Take-home kits and custom trays are also available for purchase online.

59.    Many dentists in Georgia and elsewhere offer customers both in-person teeth whitening services and take-home teeth whitening kits. A common in-person procedure offered by dentists consists of covering the gums with a protective material, applying a hydrogen peroxide solution in the 20-38 percent range to the teeth, and then exposing the teeth to a light source.

60.    The concentration of hydrogen peroxide applied to the customer's teeth at non-dentist outlets generally falls into the 10-20 percent range. This is a concentration equivalent or greater than that typically contained in most OTC products (often 10 percent or less), but may be less than the concentration employed by dentists during in-office visits (up to 20-38 percent).

61.    Numerous companies, including Beaming White, SmileLabs, DaVinci Teeth Whitening, Maui Whitening and others, allow non-dentists to re-sell and use their products independently. They also offer non-dentists the option of becoming a franchisee offering teeth whitening services.

62.     These companies, as well as others that sell teeth whitening products and equipment, also offer in-person and online training or certification programs for dentists and non-dentists to instruct them in the proper use of the products or equipment. On information and belief, the training or certification programs and instructions offered by these companies to dentists and non-dentists do not differ materially.

63.     Generally, teeth whitening products and equipment include written instructions with the product. Written instructions are also often available online. Providers following best practices, whether non-dentists or dentists, perform teeth whitening services consistent with the instructions included with the teeth whitening product or equipment.

64.     The health and safety risks associated with teeth whitening are minimal, and consist primarily of temporary tooth sensitivity and gum irritation. This limited discomfort typically only lasts for short period of time (*e.g.*, a few hours to a few days). The provision of teeth whitening services and use of teeth whitening

products, including take-home kits, do not pose present, significant and substantiated risks that threaten public health and safety.

65.     The risks associated with proper self-administration of teeth whitening products do not materially vary from the risks associated with teeth whitening services provided by a dentist or non-dentist. Nonetheless, some customers that purchase teeth whitening products may have little experience in applying the products, may disregard the manufacturer's instructions in using the product, or use unreliable third party sources (including those available online) in applying the products. On information and belief, the risks posed to such customers are greater than that posed to customers that obtain teeth whitening services from non-dentists. Notwithstanding that the risks posed to such customers may be greater than those posed to customers obtaining teeth whitening services from dentists or non-dentists, the Board has never suggested that the sale of teeth whitening products or equipment to consumers in Georgia poses a present, significant, or substantiated risk to public health and safety. On information and belief, the Board has never performed any study attempting to assess any public health or safety risk from the sale of teeth whitening products and equipment to consumers in Georgia. On information and belief, the Board has never gathered any evidence or issued any

report concerning the effect of the sale of teeth whitening products and equipment to consumers in Georgia. On information and belief, the Board has never held any hearing or otherwise engaged in any process to assess whether the sale of teeth whitening products and equipment to consumers in Georgia poses a present or substantial risk to public health and safety in the State.

66.    Similarly, the Board has never taken any steps to establish that the provision of teeth whitening services by non-dentists poses a present and significant risk to public health and safety in Georgia. On information and belief, the Board has never performed any study attempting to assess any public health or safety risk from the provision of teeth whitening services by non-dentists in Georgia. On information and belief, the Board has never gathered any evidence or issued any report concerning the effect of the provision of teeth whitening services by non-dentists on public health and safety in Georgia. On information and belief, the Board has never held any hearing or otherwise engaged in any process to assess whether the provision of teeth whitening services by non-dentists in Georgia poses a present or substantial risk to public health and safety in the State.

67.    There is good reason that the Board has not ever determined that provision

of teeth whitening services by non-dentists poses as present and significant risk to

public health and safety in Georgia. Receiving teeth whitening services is safer and

less invasive than other oral cosmetic procedures that are not regulated as the

practice of dentistry, such as tongue and mouth piercing, which the American

Dental Association advises can lead to infections or cracked teeth.

68.    Teeth whitening products typically found in traditional brick-and-mortar

retail outlets, such as OTC whitening strips, toothpastes, and rinses (i.e. OTC

products) are not generally viewed as adequate substitutes for teeth whitening

services because of differences in the nature of the product, quality, cost, comfort,

convenience and overall customer experience. In particular, there is a significant

difference in the overall customer experience based on support services offered and

the selection of products available. Moreover, suppliers of teeth whitening services

typically offer customers hands-on advice and in-person instruction, follow-up

customer support, access to a wider selection of products, options for

customization, and a more comfortable setting for customers to apply products.

These services are distinct from those offered by sales representatives that sell

OTC products, whose services are limited to assistance with product selection

(which itself is likely to be less tailored to the specific customer's needs) and completing purchases. Therefore, if the prices for teeth whitening services should increase, a substantial number of consumers will not turn to OTC products but will continue to purchase teeth whitening services.

69.     Teeth whitening services provided by dentists and non-dentists, however, are substitutable (*i.e.*, these services have positive cross-elasticity of demand) and entail the use of teeth whitening products that are reasonably interchangeable. While there may be variation in the products used and services offered by dentists and non-dentists, both offer a similar range of services and in-person assistance and tailored customer support sought by customers of teeth whitening services. Therefore, if the prices for teeth whitening services for dentists were to increase, a substantial number of consumers would turn to and purchase teeth whitening services from non-dentist suppliers.

70.     Teeth whitening services performed by non-dentists are much less expensive than those performed by dentists. A non-dentist typically charges $50 to $200 per session, whereas dentists typically charge $300 to $700. While Plaintiff Julien was performing teeth whitening services through Plaintiff Smiles, she charged

customers between $50 and $175 per session, which covered the costs of her services and products used while performing the services. On information and belief, Plaintiffs' prices to customers for teeth whitening services were substantially below the prices for such teeth whitening services charged by dentists in Georgia.

71.     The sale of take-home kits provided by dentists and non-dentists are substitutable (*i.e.*, these products have positive cross-elasticity of demand). Typically, a customer who uses the teeth whitening services of a dentist or non-dentist will purchase take-home-kits from the service provider. Because customers will turn to non-dentists for teeth whitening services if the price of teeth whitening services from dentists increases, customers will also turn to non-dentists for the provision of take-home kits.

72.     The relevant product market in which to evaluate the conduct of the Board is the provision of both teeth whitening services and take-home whitening kits ( "**Relevant Product Market**"). Teeth whitening services are offered by dentists and non-dentists in Georgia and across the country.

73.     The relevant geographic market in which to evaluate the conduct of the Board is the State of Georgia (the "**Relevant Geographic Market**"). The Board purports to exercise authority over the provision of teeth whitening services in Georgia. Furthermore, consumers in Georgia almost always seek teeth whitening services from local providers in the State. Consumers who desire teeth whitening services in Georgia do not travel great distances and certainly not out-of-state in any appreciable numbers to obtain teeth whitening services. If the price of teeth whitening services in Georgia increases as a result of actions of the Board, consumers in Georgia will not seek teeth whitening services from providers in other states. Similarly, if non-dentists are not permitted to provide teeth whitening services in Georgia as a result of the actions of the Board, consumers desiring to purchase teeth whitening services will not go out-of-state to seek teeth whitening services from non-dentists. Rather, such consumers will pay the higher prices for teeth whitening services in Georgia and seek such services only from dentists in Georgia.

## SUPRESSING COMPETITION

74.     The Board has engaged in numerous anticompetitive activities aimed at, and having the real and intended effect of, excluding non-dentists from the Relevant

Product Market or the Alternative Relevant Product Market and the Relevant

Geographic Market (collectively, the Relevant Product Market and Relevant

Geographic Market and the Alternative Relevant Product Market and Relevant

Geographic Market are hereinafter referred to as the "**Relevant Market**").

75.    Beginning at the latest in the early 2000s, non-dentists started offering teeth

whitening services in Georgia, often at significantly lower prices than dentists,

sometimes for hundreds of dollars less per treatment. Shortly thereafter, dentists in

the State began complaining to the Board about non-dentists that provide teeth

whitening services. On information and belief, several complaints related to the

prices at which non-dentists offered teeth whitening services.

76.    After receiving complaints from dentists, the Board began opening

investigations into teeth whitening services performed by non-dentists.

77.    The Board discussed the increasing number of complaints about non-dentist

teeth whitening services during meetings. Subsequently, the Board agreed to take

action consistent with practicing dentists' requests to shut down non-dentist

providers of competing teeth whitening services.

78.     On information and belief, Members of the Board also had internal discussions related to teeth whitening services provided by non-dentists and committed to take extra-judicial action to restrict these services. The topic was discussed during Board meetings and was an issue of general interest with practicing dentists in the State. Moreover, as noted above, on at least one occasion the Board responded to a request asking whether the provision of teeth whitening services constitutes the practice of dentistry. *See* Ex. B.

79.     In determining that the provision teeth whitening services is covered by the Act, the Board never issued formal policy guidance and instead relied on its extra-judicial enforcement powers to effectuate its policy. For example, on October 9, 2009, the Board held a hearing in the matter of Keyana Tomika Breland, doing business as Narcissus Smile, Inc. Ms. Breland was charged with practicing dentistry without a license as a result of her provision of teeth whitening services. Ms. Breland appeared at the Board's hearing and asserted that the provision of teeth whitening services did not constitute the practice of dentistry. Without addressing the substance of Ms. Breland's assertions by applying its governing statute, the Board simply noted that "the provision of such services by an

unlicensed person is akin to unlicensed persons providing services to other people involving shampooing hair or performing nail care which requires licensure as a cosmetologist." *See* Ex. C. The Board then issued an order directing Ms. Breland to cease-and-desist from the provision of teeth whitening services anywhere in the State of Georgia. *Id.* Thus, even in its adjudicatory proceedings, the Board has not justified the issuance of a cease-and-desist order by reference to its putative authority under the Act, explained the source of its authority to regulate or prohibit the provision of teeth whitening services by non-dentists, or identified any threat to public health or safety resulting from the provision of teeth whitening services by non-dentists in Georgia.

80.     Unlike Ms. Breland, most non-dentists performing teeth whitening services and charged by the Board with the unlicensed practice of dentistry do not contest the charges. Many non-dentists performing teeth whitening services in Georgia, such as Plaintiffs, are small businesses without significant revenues. Plaintiff Julien, for example, offered teeth whitening services before the issuance of the Order on a part-time basis and had other employment. For non-dentists, such as Plaintiff Julien, that offer or wish to offer teeth whitening services on a part-time basis or as a small part of a larger business, such as a spa or resort, the cost of

appearing before the Board may well exceed the revenues derived from the provision of the service. On information and belief, the Board and its Members know that contesting the charges of unlicensed practice of dentistry is prohibitive for many non-dentists. Therefore, on information and belief, the Board and its Members know that most non-dentists will simply consent to the issuance of a cease-and-desist order without regard to the underlying legal merits of the Board's position on whether teeth whitening services constitutes the practice of dentistry under Georgia law or whether the Board has authority to regulate the provision of teeth whitening services.

81.     In addition to the prohibitive costs of challenging the Board's assertion of authority, on information and belief, many non-dentists are intimidated by the Board and its investigators who threaten significant fines and other sanctions, including, among other things, criminal penalties if the non-dentist continues to provide teeth whitening services. Accordingly, as a result of these threats, many non-dentists confronted by the Board or its investigators with charges of unlicensed practice of dentistry for providing teeth whitening services will consent to the entry of a cease-and-desist order and stop providing the services. Although the Board labels these cease-and-desist orders "voluntary," they are not voluntarily

entered and result from the Board's asserted authority and threat to impose fines and criminal penalties.

82.     The Board has engaged in extra-judicial activities aimed at preventing non-dentists from providing teeth whitening services in Georgia since at least 2008. These actions are not expressly authorized by statute and circumvented review or oversight by an independent state authority unaffiliated with the Board.

83.     The Board was not and is not required to submit its investigative findings or enforcement orders to an independent state agency or supervising state actor for purposes of undergoing substantive review. On information and belief, "voluntary" cease-and-desist orders are given legal effect upon approval of the Board and do not indicate whether an unaffiliated independent state actor has reviewed the contents of the order or approved of the Board's action.

84.     On information and belief, the Board has transmitted cease-and-desist orders to dozens of non-dentists providing teeth whitening services, communicating to recipients that they were practicing dentistry without a license and ordering recipients to cease-and-desist from providing teeth whitening services. These

orders are issued on papers containing the Board's official crest or seal, which contain the Seal of the State of Georgia, and demand that non-dentists providing teeth whitening services cease and desist from all activities purportedly constituting the "practice of dentistry". These orders refer to or threaten fines associated with the unauthorized practice of dentistry, which constitutes a felony under the Act.

85.    The Board has also opened investigations, issued subpoenas, and threatened legal action against numerous non-dentists who were considering or planning to open a business that offers teeth whitening services. The Board communicated its position that offering teeth whitening services without the supervision of a dentist constitutes the unauthorized "practice of dentistry."

86.    The Board has used its investigators and agents to threaten and intimidate non-dentists, including Plaintiff Julien, from providing teeth whitening services.

87.    Through these efforts, the Board has pursued a lengthy and consistent campaign of using extra-judicial means to exclude non-dentists from the Relevant

Market. The Board's established pattern and program of taking disciplinary actions against non-dentists has a substantial effect on competition in the Relevant Market.

88.     The Board has consistently engaged in these practices with the aim of eliminating the provision of teeth whitening services by non-dentists. The Board's authority to control entry into the practice of dentistry coupled with its asserted authority to prohibit non-dentists from offering teeth whitening services in Georgia give the Board and dentists substantial power over the prices and choices of teeth whitening services available to consumers in Georgia. The Board, its Members, and licensed dentists in Georgia, on whose behalf the Board has acted, have the ability, and have exercised the ability, to raise and maintain prices for teeth whitening services in Georgia above, and reduce quality below, competitive levels. The Board and its Members, therefore, have market power and monopoly power in the Relevant Market.

89.     The Board's actions are effectuated and implemented by its controlling dentist Members on a collective basis. The actions are taken pursuant to agreements reached among the dentist Members of the Board and also with other practicing dentists that are also market participants in the Relevant Market.

90.     The Board frequently threatens individuals and small business entities, such as Plaintiffs, with high civil fines and potential criminal sanctions to coerce non-dentists offering teeth whitening services to sign "voluntary" cease-and-desist orders, shut down their operations, and ensure non-dentists do not challenge the Board's actions or provide lower-cost teeth whitening services in Georgia. In lieu of litigating the matter, the Board allows non-dentists offering teeth whitening services to enter into "voluntary" cease and desist orders, under which an individual, a small business, or both will be prohibited from providing teeth whitening services anywhere in Georgia and waives any rights they have to a hearing in the matter.

91.     The Board's actions are taken subject to agreement among the Members and on behalf of other practicing dentists in the State of Georgia. In addition to the explicit agreements among the Board and its Members, the conduct of the Board constitutes concerted action and establishes an agreement by and among its Members and practicing dentists in the State of Georgia.

92.     The Board's Dentist Members have a direct or indirect financial interest in the rules related to teeth whitening services and therefore have incentive to raise the price of teeth whitening services above the competitive level and to reduce competition from non-dentists.

93.     In prohibiting non-dentists from offering teeth whitening services, the Board has restricted the supply of teeth whitening services in the State.

94.     By restricting the supply of teeth whitening services, dentists in the State of Georgia that offer teeth whitening services, including at least 7 of the Members of the Board, have directly benefited from the diminishment of competition and the ability to charge consumers supra-competitive prices. Acquiescence to the dentists' complaints also reflects active efforts by dentist Board Members to maintain goodwill of their colleagues, including those with whom Board Members have pre-existing financial ties or professional relationships.

95.     Dentists and others operating under the supervision of dentists in the State also benefit indirectly from the Board's efforts to exclude non-dentists that offer teeth-whitening services. By affording those with dental licenses the exclusive

privilege to offer teeth whitening services to customers, the value of possessing a dental license increases.

96.    The Board is the sole licensing authority for dentists in the State of Georgia.

## PLAINTIFF AND HER BUSINESS

97.    Plaintiff Julien has over 15 years of dental assistance experience, including service with the military. Plaintiff Julien was honorably discharged after finishing a 4 year commitment and left the military as a dental lab technician, a role in which she created crowns, dentures, and other dental prostheses. Plaintiff Julien moved to Atlanta in 2007, at which time she worked as an assistant in cosmetic dental offices. She has since advanced to managing business operations for a dental practice.

98.    Plaintiff Julien learned about alternative teeth whitening products and gained experience providing in-office teeth whitening services to customers during her work as a dental assistant. Plaintiff Julien was trained in how to provide teeth whitening services and operate teeth whitening equipment by a dental assistant acting under the supervision of a licensed dentist. Plaintiff Julien  also obtained

certification by completing online training provided by a company offering teeth whitening products.

99.     On or about May 2013, Plaintiff Julien opened Plaintiff Smiles as a teeth whitening business. Plaintiff Julien rented out a suite in an office building from which she ran Smiles. During this time, Plaintiffs Julien and Smiles offered teeth whitening services in the office. Plaintiffs Julien and Smiles operated until the day the Board issued the Order, on or about May 21, 2015.

100.   Plaintiffs offered three teeth whitening packages: silver, gold, and platinum. As part of each package, Plaintiffs sold a customer a whitening product that the customer would self-apply on-site and Plaintiffs provided teeth whitening services. The difference between the packages was the strength of the whitening product purchased for self-application and the duration of application. Specifically, 44% carbamide peroxide gel was used for the Silver package, which cost $79; 16% hydrogen peroxide gel for the Gold package, which cost $99; and 16% hydrogen peroxide gel for a longer duration for the Platinum package, which cost $175. All sessions were typically between 30 to 60 minutes. In addition, Plaintiffs charged $50 for a take-home kit.

101.   After selecting and purchasing a whitening package, the customer would place the teeth whitening product into his or her own mouth and apply the product directly to his or her own teeth. During this time, Plaintiff Julien provided general advice in accordance with the written instructions accompanying the products and supervised the customer to ensure that the customer used the product properly and was not experiencing discomfort. After fitting and applying the product, the customer would position an LED light source in front of his or her mouth, sometimes with Plaintiff Julien's assistance.

102.   Plaintiffs also sold one take-home whitening kit containing a fitted tray. The fitted tray and whitening gel were sold separately for take-home use and made to be used for about one to two weeks. During this time, Plaintiff also provided continued customer support and periodically checked in with the customer. For take-home kits, the whitening product contained approximately 16% hydrogen peroxide.

103.   Plaintiffs' teeth whitening services also consisted of discussing the advantages and disadvantages of teeth whitening products with the customer;

recommending products based on information supplied by the customer; advising the customer on how to use the prepackaged teeth whitening product that the customers purchased; providing a sanitary area and a comfortable chair for the customer while the customer used the purchased product at the Smiles location; supervising the customer while the purchased product was being used and ensuring proper product use; providing customers with an enhancing light; checking in with customers about their results; and answering questions about how to use different products.

104.   Plaintiff Julien provided guidance and instruction consistent with her training in the dental field and the manufacturer's instructions that were included with the teeth whitening products and equipment she used in offering teeth whitening services.

105.   During the time that she provided teeth whitening services through Plaintiff Smiles, Plaintiff Julien did not enter customers' mouths. Rather, consistent with the typical practice, she discussed products with customers, provided comfortable chairs, instructed customer on how to apply the products to their teeth, and provided lighting that would enhance the whitening properties of the products.

106.   At no time did Plaintiff Julien ever attempt to diagnose, treat or operate on any customer's mouth or teeth or offer any dental assessments.

107.   Plaintiff Julien referred customers to dentists when they inquired about dental services.

108.   Plaintiffs sold Beaming White® whitening products and used a ZOOM! branded LED light.

109.   All teeth whitening products sold by Plaintiffs were disposable and purchased by Plaintiffs online. On information and belief, these products and products of similar concentrations are made available online to consumers, including businesses and end-use customers in Georgia.

110.   Plaintiff Julien operated Plaintiff Smiles on a part-time basis, during which time she worked primarily as a dental assistant and, later, a dental manager.

111.   Plaintiff Julien currently works as a dental manager. This position is unrelated to Plaintiff Smiles, which she operated prior to May 21, 2015.

## EXCLUSION OF PLAINTIFF FROM MARKET

112.   On or about May 21, 2015, Ryan McNeil, the Chief Investigator for the Board and an agent thereof, came to Plaintiff's business under the guise of being a customer. Mr. McNeil was carrying a hand-held radio and did not initially disclose that Plaintiffs had been under investigation.

113.   Plaintiffs had not received any customer complaints regarding their provision of teeth whitening services at any time.

114.   Plaintiff Julien introduced herself and showed Mr. McNeil the chair in which customers sit during the whitening procedure. At this point, Mr. McNeil informed Plaintiff that he was acting on the Board's behalf and had come to serve her with the Order.

115.   Mr. McNeil informed Plaintiff Julien that because she did not have a dental license, she and Smiles were engaging in the unauthorized practice of dentistry in

violation of the Act. Mr. McNeil then informed Plaintiff Julien that if she did not

sign the Order that day, she would be subjected to heavy fines and potentially

criminal sanctions. As a result of these events and the threat of high civil penalties

and potential criminal sanctions, Plaintiff Julien was pressured and intimidated by

Mr. McNeil into signing the Order in her own name. But for Mr. McNeil's threats

of fines and penalties, Plaintiff would not have signed the Order. On information

and belief, it has been the practice of the Board to use threats of fines and penalties

to coerce non-dentist teeth whitening suppliers to sign cease and desist orders

involuntarily, as Plaintiff Julien did, to avoid any challenges and review of the

Board's action in respect to non-dentist teeth whitening service suppliers.

Notwithstanding these pervasive and coercive threats, the Board persists in calling

cease-and-desist orders entered into by non-dentists under circumstances similar to

those in which Plaintiff Julien signed the Order as "voluntary."


116.   Mr. McNeil further told Plaintiff Julien that, in signing the Order, she would

be prohibited from selling both teeth whitening products and associated services

even though nothing in the Act prohibits any person from selling teeth whitening

products or requires any licensure to sell any such products, or otherwise purports

to regulate the sale of such products by any persons.

117.   Plaintiff Julien explained to Mr. McNeil the nature of the services that she and Smiles offered and informed Mr. McNeil that she did not physically enter any customer's mouth. Mr. McNeil stated her services still constituted the unauthorized practice of dentistry.

118.   Plaintiff Julien asked Mr. McNeil about the Supreme Court's decision involving an action brought by the Federal Trade Commission against the North Carolina State Board of Dental Examiners, which engaged in anticompetitive behavior virtually identical to that of the Board. Mr. McNeil stated the Board was not bound by that decision. In short, Mr. McNeil made several deceptive or misleading statements at the time that he presented Plaintiff Julien with the Order and demanded that she sign it.

119.   Prior to Mr. McNeil's visit to Smiles' business location, neither Plaintiff Julien nor Smiles was given any notice that the Board was conducting an investigation of Plaintiff's business or that the Board intended to issue the Order against Plaintiff Julien. Plaintiff was served in person during business operations without the practical ability at that moment to consult a lawyer or third party for

assistance.  Furthermore, Mr. McNeil, upon entering Smiles' business location, did not identify himself as an investigator for the Board. Rather, he posed as a customer.

120.   Mr. McNeil insisted Plaintiff Julien sign the Order without first seeking legal advice and without an attorney present. Plaintiff Julien did not seek legal representation after being issued the Order and was not otherwise informed of her legal rights to an attorney.

121.   Plaintiff Julien has not actively operated Smiles since receiving the Order and has not otherwise provided or sold teeth whitening services or products during the same period of time.

122.   The Order provides that it goes into effect upon the approval of the Board without requiring prior approval from an independent state actor unaffiliated with the Board. The Board approved the order on or about September 14, 2015. On information and belief, the Board's decision to approve the Order on or about September 14, 2015 was not reviewed by any state agency or actor. The Order became effective immediately upon the Board's approval.

123.   As a direct result of the Board's issuance of the Order, Plaintiff Julien was denied employment with Dr. Ashley Curington, DMD ("**Dr. Curington**") of the North Atlanta Center for Cosmetic & Implant Dentistry, PC of Buford, Georgia.

124.   Prior to learning of the Order, Dr. Curington had offered Plaintiff Julien an employment opportunity in or around February 2017 (*e.g.*, Dr. Curington had given Plaintiff Julien proposed working hours). Dr. Curington also asked Plaintiff Julien to give her then-employer "whatever notice they need so they aren't in a bind. We will wait for [you]," and that Plaintiff Julien should "[t]ake whatever time [Julien's then-employer] needs and make sure you were fair to him. If he needs up to three weeks that is fine."

125.   Dr. Curington was excited to hire Plaintiff Julien after meeting with her for an interview, stating she had "great qualifications and really [is] an asset."

126.   But upon learning of the Order from the Board, Dr. Curington withdrew her offer to Plaintiff Julien, stating she was "hesitant because I have an uneasy feeling about that whole board situation" and that she holds her office to a high standard

because it is the "crème de la crème." Dr. Curington would have formally hired Plaintiff Julien if the Order had not been issued.

127.   But for the Order, Plaintiff Julien would have been employed by Dr. Curington at the North Atlanta Center for Cosmetic & Implant Dentistry, which in turn would have resulted increased Plaintiff Julien's compensation of at least around $17,000 per year plus any additional benefits.

## ANTICOMPETITIVE EFFECTS

128.   The exclusionary course of conduct of the Board as alleged above will, and may reasonably be expected to continue in the absence of effective relief.

129.   As a consequence of the challenged actions and course of conduct taken by the Board to shut down competing operations like that of Plaintiffs, the availability of non-dentist teeth whitening services in Georgia has significantly declined and will continue to do so.

130.   Numerous businesses, like that of Plaintiffs, have shut down entirely as a result of the Board's actions and course of conduct. Due to the inconsistent manner

in which enforcement actions are brought and the lack of formal written guidance related to teeth whitening services, many businesses have ceased selling teeth whitening products and teeth whitening services altogether. Further, many businesses have curtailed their advertising for teeth whitening or are otherwise unable to offer the types of services desired by customers.

131.  The challenged actions and course of conduct taken by the Board have had and will continue to have the effect of restricting the supply for teeth whitening services, restraining competition unreasonably and injuring consumers in the following ways, among others:

a.  preventing and deterring non-dentists from providing teeth whitening services in Georgia;

b.  depriving consumers of the benefits of competition on price and quality for teeth whitening services in Georgia;

c.  reducing consumer choice and the availability of teeth whitening services to customers in Georgia;

d.  reducing incentives for innovation and the ability of non-dentist providers to offer new teeth whitening services (and products); and

e.      increasing the prices that customers in Georgia pay for teeth

whitening services.

## **INJURY**

132.   Plaintiffs restate, reaffirm, and incorporate by reference the paragraphs

above as if fully set forth herein.

133.   Plaintiff Julien wishes to continue her business, but faced with the prospect

of numerous fines and potential criminal sanctions, she has no practical ability to

do so.

134.   Plaintiff Julien closed her teeth whitening business, Smiles, in response to

the Georgia Board of Dentistry's assertion that the provision teeth whitening

services by non-dentists constitutes the unlicensed practice of dentistry. Her

business remains closed because the Board issued the Order and threatened her

with fines and other potential punishments if she were to reopen the business.

135.   But for the Board's prohibition on non-dentist teeth whitening, Plaintiff Julien would have continued to operate Smiles and would have continued to provide teeth whitening services part-time and would have eventually committed to working full time given the growth her business had achieved.

136.   Plaintiffs generated several thousand dollars in revenue from providing teeth whitening services in 2014 and 2015. But for the Order, Plaintiffs business would have continued to receive this revenue.

137.   On information or belief, but for the Board's Order, Plaintiff Julien would have been employed in a new dental office position, and her compensation would have risen by around $17,000 plus any additional benefits.

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

## (15 U.S.C. § 1)

138.   Plaintiffs restate, reaffirm, and incorporate by reference the paragraphs above as if fully set forth herein.

139.   The Defendants, by and through their anticompetitive actions as outlined herein, entered a contract, combination or conspiracy in restraint of trade and commerce to exclude non-dentists, including, but not limited to Plaintiffs, from the Relevant Market, and thereby have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

140.   The Defendants have agreed and acted upon a policy of excluding non-dentists from competing in the Relevant Market. See *e.g.* Ex. A.

141.   The Defendants demonstrated a unity of purpose, as well as common design and understanding, to eliminate non-dentists from providing teeth whitening services in Georgia.

142.   The Defendants possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective.

143.   The Defendants' actions constitute a continuing agreement, understanding, and concert of action among market participants that are practicing dentists in the State of Georgia.

144.   The Defendants' actions have the purpose and effect of unreasonably restraining trade in the Relevant Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pretextual.  The Defendants' actions have the following anticompetitive effects in the Relevant Market:

a.   preventing and deterring non-dentists from providing teeth whitening services in Georgia;

b.   depriving consumers of the benefits of competition on price and quality for teeth whitening services in Georgia;

c.   reducing consumer choice and the availability of teeth whitening services to customers in Georgia;

d.   reducing incentives for innovation and the ability of non-dentist providers to offer new teeth whitening services (and products); and

e.   increasing the prices that customers in Georgia pay for teeth whitening services.

145.   The Defendants' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

146.   Alternatively, the Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "quick-look" rule of reason analysis. On their face, the Defendants' actions restrict, and are intended to restrict, the number of providers teeth whitening services in the State of Georgia and to raise, maintain, or stabilize the prices of teeth whitening services in the State of Georgia above competitive levels. Defendants have market power in the Relevant Market and can enforce their output-restricting agreement by using the legal process of the State of Georgia to preclude entrance into the Relevant Market. Defendants can and do use investigators of the State of Georgia to locate persons who offer teeth whitening services in contravention of their agreement that only licensed dentists offer the service and threaten to use the office of Defendant Carr to enforce criminal sanctions against any individual or business that operates in contravention of their agreement. Defendants are market participants and have incentives to restrict competition in the Relevant Market, and no legitimate business justification exists for Defendants' agreement.

147.   The Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. On their face, the Defendants' actions restrict, and are intended to restrict, the number of providers teeth whitening services in the State of Georgia and to raise, maintain, or stabilize the prices of teeth whitening services in the State of Georgia above competitive levels. Defendants have market power in the Relevant Market and can enforce their output-restricting agreement by using the legal process of the State of Georgia to preclude entrance into the Relevant Market. Defendants can and do use investigators of the State of Georgia to locate persons who offer teeth whitening services in contravention of their agreement that only licensed dentists offer the service and threaten to use the office of Defendant Carr to enforce criminal sanctions against any individual or business that operates in contravention of their agreement. Defendants are market participants and have incentives to restrict competition in the Relevant Market, and no legitimate business justification exists for Defendants' agreement.

148.   The Defendants' actions evidence predatory intent to deprive non-dentists of a fair opportunity to compete in the Relevant Market. Through their actions, Defendants intend, and have succeeded, in reducing the number of providers of

teeth whitening services in Georgia and the output of such services. Defendants'

actions do not enhance public health and safety in Georgia and do not serve any

legitimate public purpose.

149.    As a direct, proximate, and foreseeable result of the Defendants' actions,

Plaintiff has suffered damages and injury.

150.    Accordingly, this Court may and should grant declaratory and injunctive

relief, damages, and attorneys' fees and costs.

151.    Plaintiff explicitly requests treble damages, as provided in 15 U.S.C. § 15.

## COUNT II

## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

## (15 U.S.C. § 2)

152.    Plaintiffs restate, reaffirm, and incorporate by reference the paragraphs

above as if fully set forth herein.

153.   The Defendants have agreed and acted upon a policy of monopolizing the Relevant Market and thereby excluding non-dentists from competing therein, and thereby have violated Section 2 of the Sherman Act, 15 U.S.C. § 2. See *e.g.* Ex. A.

154.   The Defendants collectively possess monopoly power in the Relevant Market. By using the legal process of the State of Georgia, Defendants purport to have, and have exercised, the ability to control entry into the Relevant Market. By restricting entry into the Relevant Market through the use of cease-and-desist orders and the in terrorem threat of sanctions against non-dentists who wish to offer teeth whitening services in the State of Georgia, Defendants have acquired and exercised the power to control prices of teeth whitening services in the State of Georgia and exclude competition from the provision of teeth whitening services in the State of Georgia.

155.   The Defendants' actions in excluding non-dentists from the Relevant Market are and have been predatory in that they make no economic sense apart from their tendency to reduce competition and maintain above-competitive prices for teeth whitening services in Georgia. In other words, Defendants' actions are designed

and have the effect of giving dentists in the State of Georgia monopoly power over the provision of teeth whitening services and maintaining that power by excluding competition in the Relevant Market from non-dentists.

156.   The Defendants lack any legitimate procompetitive justification, and any purported procompetitive justifications are pretextual.

157.   The Defendants, by and through their anticompetitive actions as outlined herein, have violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

158.   Through the Defendants' exclusionary conduct, market participants, who are practicing dentists in the State, acquired, maintained, and exercised monopoly power. Furthermore, the willful acquisition and maintenance of monopoly power on behalf of market participants evidence Defendants' specific intent to monopolize and attempt to monopolize the Relevant Market.

The agreements reached and actions taken by and among Defendants on behalf of market participants establish the existence of a combination or conspiracy to

monopolize the Relevant Market. In addition, in acting upon a policy to monopolize the relevant market on behalf of market participants, Defendants exclusionary conduct constitutes overt acts taken in furtherance of the conspiracy to monopolize the Relevant Market. Furthermore, Defendant's exclusionary conduct evidences Defendants' specific intent to monopolize and attempt to monopolize the Relevant Market.

159.   As a direct, proximate, and foreseeable result of the Defendants' actions, Plaintiff has suffered damages and injury.

160.   Accordingly, this Court may and should grant declaratory and injunctive relief, damages, and attorneys' fees and costs.

161.   Plaintiff explicitly requests treble damages, as provided in 15 U.S.C. § 15.

## COUNT III

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE

## FOURTEENTH AMENDMENT

162.   Plaintiffs restate, reaffirm, and incorporate by reference the paragraphs above as if fully set forth herein.

163.   This Count is brought pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983

164.   The Georgia Dental Practice Act provides that only licensed dentists are authorized to provide services that constitute the practice of dentistry. O.C.G.A. § 43-11-50.

165.   The Board admits the "practice of dentistry" excludes the retail sale of teeth whitening products and does not otherwise consider such sales to constitute unlicensed activity in the State. Def.'s Reply Mem., *Holton v. Battle*, Case No. 1:14-cv-03824, ECF No. 98 at 7 (N.D. Ga. Jan. 23, 2017) ("Georgia's Dental Practice Act does not permit the Board to regulate product sales."); Def.'s Reply Mem., *Colindres v. Battle*, Case No. 1:15-cv-02843, ECF No. 16 at 12 (N.D. Ga. Oct. 14, 2015) ("The Dental Practice Act, however, does not regulate the sale of products.").

166.   The Board may bring an action to enjoin any person, firm, partnership, or corporation from engaging in unlicensed activities. Ga. Code. § 43-11-2(e).

167.   In issuing the Order on behalf of the Board, Mr. McNeil informed Plaintiff that the Order, in addition to prohibiting her from providing teeth whitening services, enjoins her from retailing or selling OTC products for home use—even where no teeth whitening services are provided (regardless of the products' concentration of hydrogen peroxide or carbamide peroxide or their availability over the counter at traditional brick and mortar and online retail outlets).  The Order bears the Seal of the State of Georgia and Mr. McNeil and the Board operated ostensibly as agents of the State of Georgia in issuing the Order and under color of State law.

168.   By prohibiting plaintiff from retailing OTC products for home use, the Order prohibits plaintiff from products that are identical to those sold over the counter through traditional brick and mortar outlets. The Board has a policy and practice, manifest by the number of cease-and-desist orders that it has issued against non-dentist providers of teeth whitening services, of issuing cease-and-desist orders against persons providing teeth whitening services and teeth whitening products,

even though the Board has conceded that it has no authority to regulate the sale of teeth whitening products in the State of Georgia.

169.   To the extent the Order enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, Plaintiffs are prohibited from engaging in activities for which the Board does not require individuals, including traditional brick-and-mortar and online retail outlets, to obtain a license.

170.   To the extent the Order enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, the Board seeks to enjoin Plaintiffs from engaging in otherwise lawful activity that the Board itself admits is beyond the scope of the Act. See Ga. Code. § 43-11-2(e). Def.'s Reply Mem., *Holton v. Battle*, Case No. 1:14-cv-03824, ECF No. 98 at 7 (N.D. Ga. Jan. 23, 2017) ("Georgia's Dental Practice Act does not permit the Board to regulate product sales."); Def.'s Reply Mem., *Colindres v. Battle*, Case No. 1:15-cv-02843, ECF No. 16 at 12 (N.D. Ga. Oct. 14, 2015) ("The Dental Practice Act, however, does not regulate the sale of products.").

171.   The Due Process Clause of the Fourteenth requires reasonable that State's provide notice and reasonable opportunity to be heard to present a claim or defense before depriving persons of life, liberty, or property.

172.   Plaintiffs possess liberty and property interests in the possession and sale of teeth whitening products which, according to Mr. McNeal acting as an agent of the Board and under the color of State law, Plaintiffs are prohibited from selling. Therefore, the Order issued by the Board under color of State law and through Mr. McNeal, who is, upon information and belief, a state employee and was, at all relevant times, acting as an agent of the Board deprives Plaintiffs of both liberty and property interests that they possessed prior to the issuance of the Order.

173.   To the extent the Order, which was issued under the color of State law, enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, the Board's decision was unilaterally carried into effect by the Board without prior notice that the Board's extra-judicial activities could extend to otherwise lawful activity, such as retail sales of teeth whitening products for home use that are widely available over the counter.

174.   To the extent the Order, which was issued under the color of State law, enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, Plaintiffs received no explanation or specifics as to why the Board sought to enjoin them from engaging in otherwise lawful activity in addition to what the Board considered to constitute the unlicensed practice of dentistry. Further, Mr. McNeil, as an agent of the Board and acting under color of State law, did not explain to Plaintiffs the types of retail sales related to teeth whitening the Board considered to be lawful and unlawful, instead explaining the Board had general discretion to regulate all such activities as it sees fit.

175.   To the extent the Order, which was issued under the color of State law, prohibits Plaintiffs from engaging in the retail sale of OTC products for home use, there is no rational relationship between the actions of the Board and Mr. McNeil and any legitimate governmental interest of the State of Georgia.

176.   To the extent the Order, which was issued under the color of State law, enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, the Defendants' actions deprive Plaintiffs of the protections guaranteed by the Due Process Clause of the Fourteenth Amendment.

177.   Plaintiffs have suffered damages and injury as a result of Defendants'
actions. Specifically, Plaintiffs have been deprived of their liberty and property
interests in the possession and sale of teeth whitening products.

178.   Accordingly, this Court may and should grant declaratory and injunctive
relief restraining Defendants' action depriving Plaintiffs of those liberty and
property interests and award Plaintiffs damages and attorneys' fees and costs for
Defendants' violations of the Due Process Clause of the Fourteenth Amendment.

## COUNT IV

## VIOLATION OF THE EQUAL PROTECTION CLAUSE   OF THE FOURTEENTH AMENDMENT

179.   Plaintiffs restate, reaffirm, and incorporate by reference the paragraphs
above as if fully set forth herein.

180.   This Count is brought pursuant to the Equal Protection Clause of the
Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

181.   In issuing the Order, which was issued under color of State law, on behalf of the Board, Mr. McNeil informed Plaintiffs that the Order, in addition to prohibiting them from providing teeth whitening services, enjoins them from retailing or selling OTC products for home use—even when no teeth whitening services are provided and (regardless of the products' concentration of hydrogen peroxide or carbamide peroxide or their availability over the counter at traditional brick and mortar and online retail outlets).  The Order bears the Seal of the State of Georgia and Mr. McNeil and the Board operated ostensibly as agents of the State of Georgia and acted under the color of State law in issuing the Order.

182.   The Board admits the "practice of dentistry" excludes the retail sale of teeth whitening products and does not otherwise consider such sales to constitute unlicensed activity in the State. Def.'s Reply Mem., *Holton v. Battle*, Case No. 1:14-cv-03824, ECF No. 98 at 7 (N.D. Ga. Jan. 23, 2017) ("Georgia's Dental Practice Act does not permit the Board to regulate product sales."); Def.'s Reply Mem., *Colindres v. Battle*, Case No. 1:15-cv-02843, ECF No. 16 at 12 (N.D. Ga. Oct. 14, 2015) ("The Dental Practice Act, however, does not regulate the sale of products.").

183.   In broadly prohibiting Plaintiffs from retailing teeth OTC products for home use, the Order prohibits Plaintiffs from selling teeth whitening products that are identical to those sold over the counter through traditional brick-and-mortar outlets.

184.   To the extent the Order, which was issued under color of State law, prohibits Plaintiffs from engaging in the retail sale of OTC products for home use, the Order denies Plaintiffs equal protection of law because there is no rational reason for the Board's distinction between Plaintiffs and other persons, such as traditional brick-and-mortar retailers and online sellers, who are not regulated under the Dental Practice Act, that wish to engage in the otherwise lawful retail sale of OTC products for home use. Indeed, upon information and belief, the sole reason that the Board, acting under color of State law, issued the Order preventing Plaintiffs from engaging in the retail sale of OTC products for home use was to restrict competition between non-dentists and dentists in the Relevant Market. Such reason does not constitute a legitimate governmental interest of the State of Georgia sufficient to justify the classification between Plaintiffs and traditional brick-and-mortar retailers and online sellers of teeth whitening products.

185.   To the extent the Order, which was issued under color of State law, prohibits Plaintiffs from engaging in the retail sale of OTC products for home use, there is no rational relationship between the actions of the Board and Mr. McNeil and any legitimate governmental interest of the State of Georgia.

186.   To the extent the Order, which was issued under color of State law, prohibits Plaintiffs from engaging in the retail sale of OTC products for home use, the Order denies Plaintiffs equal protection of law because there is no rational reason for the Board's distinction between Plaintiffs and other persons that received cease-and-desist orders for unauthorized practice but were not otherwise prohibited from engaging in the otherwise lawful retail sale of teeth whitening products for home use.

187.   To the extent the Order, which was issued under the color of State law, enjoins Plaintiffs from engaging in the retail sale of OTC products for home use, Defendants' actions deprive Plaintiffs of the protections guaranteed by the Equal Protection Clause.

188.   Plaintiffs have suffered damages and injury as a result of Defendants' actions.

189.   Accordingly, this Court may and should grant declaratory and injunctive relief restraining Defendants' denial to Plaintiffs of equal protection of the law and award damages, and attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and pray that the Court grant the following relief to Plaintiffs:

(a)   a declaration that the Board's actions against Plaintiffs and others in relation to the provision of teeth whitening services and take-home kits are unlawful because they violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq.;

(b)   a declaration that the Board's actions against Plaintiffs in relation to the retail sale of OTC products for home use are unconstitutional because they violate the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

(c)     a declaration that the Board's actions against Plaintiffs in relation to

the retail sale of OTC products for home use are unconstitutional

because they violate the Equal Protection Clause of the Fourteenth

Amendment of the U.S. Constitution;

(d)     a permanent injunction to restrain Defendants from future

anticompetitive enforcement activity against Plaintiff or others in

relation the provision of teeth whitening services and take home kits;

(e)     a permanent injunction to restrain Defendants from unconstitutional

enforcement activity against Plaintiff in relation to the retail sale of

OTC products for home use;

(f)     an award of damages to compensate Plaintiff for injuries suffered as a

direct result and predictable consequences of Defendants'

anticompetitive and unconstitutional activity;

(g)     that Plaintiffs be awarded their costs, including but not limited to all

        attorneys' fees, in connection with this matter;

(h)     treble damages for Plaintiffs' injuries suffered as a result of

        Defendants' violations of sections 1-2 of the Sherman Act, 15 U.S.C.

        §§ 1-2; and

(i)     such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

In accordance with Rule 38 of the Federal Rules of Civil Procedure,

Plaintiffs respectfully demand a jury trial of all issues triable to a jury in this

action.

Dated: October 12, 2017                    Respectfully submitted,

  /s/ *Yasha Heidari*


Yasha Heidari (GA Bar No. 110325)
Heidari Power Law Group, LLC
1072 W. Peachtree St. # 79217
Atlanta, GA 30357
Telephone: (404) 939-2742
Facsimile: (404) 601-7852
E-mail: yasha@hplawgroup.com

William L. Monts, III
(*pro hac vice* to be submitted)
Daniel S. Graulich
(*pro hac vice* to be submitted)
Nicholas Brod
(*pro hac vice* to be submitted)
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: 202.637.5600
Facsimile: 202.637.5910

*Counsel for Plaintiffs Jessica Julien and
Hollywood Smiles ATL, LLC*